## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
### (Baltimore Division)

| | |
|---|---|
| In re: | (Chapter 11) |
| ESCO, LTD., | Case No. 23-12237 (DER) |
| Debtor. | |

| | |
|---|---|
| ESCO, LTD. LIQUIDATING TRUST, Plaintiff, | Adv. Pro. No. 24-120 |
| v. | |
| GREG GREENBERG, THEODORE GREENBERG, BETH GREENBERG, GREENBERG FAMILY 2012 IRREVOCABLE TRUST NO. 1, GREENBERG FAMILY 2012 IRREVOCABLE TRUST NO. 2, GREENBERG FAMILY 2012 IRREVOCABLE TRUST NO. 3, GREENBERG FAMILY 2017 IRREVOCABLE TRUST NO. 4, GREENBERG FAMILY 2017 IRREVOCABLE TRUST NO. 5, AMANDA GREENBERG, AND TIFFANY SHADE, | |
| Defendants. | |

## ADVERSARY COMPLAINT

The ESCO, Ltd. Liquidating Trust ("<u>Plaintiff</u>"), established pursuant to the terms

and conditions of the *Combined Disclosure Statement and Chapter 11 Plan of Liquidation of*

**Error! Unknown document property name.**

*Debtor ESCO, Ltd.* (the "Plan"),[1] by and through its undersigned counsel, files this complaint (the "Complaint") against Defendants Greg Greenberg, Theodore Greenberg, Beth Greenberg, Greenberg Family 2012 Irrevocable Trust No. 1, Greenberg Family 2012 Irrevocable Trust No. 2, Greenberg Family 2012 Irrevocable Trust No. 3, Greenberg Family 2017 Irrevocable Trust No. 4, Greenberg Family 2017 Irrevocable Trust No. 5, Amanda Greenberg, and Tiffany Shade ("Defendants") to avoid and recover preferences or fraudulent transfers made by ESCO, Ltd. (the "Debtor") to the Defendants and to recover damages the Debtor suffered from Greg Greenberg and Theodore Greenberg's breaches of their fiduciary duties to the company, and Greg Greenberg's fraud against the company.  In support of this Complaint, Plaintiff alleges, upon information and belief, that:

## INTRODUCTION

1.      Plaintiff files this Complaint to recover millions of dollars that the Defendants siphoned from the Debtor while the Debtor was insolvent.

2.      The Debtor was a once-successful family business, owned and operated as Shoe City by the Greenberg family.  But as the Debtor sat on the brink of bankruptcy, the Greenberg family Defendants extracted excessive payments for themselves in the form

---

[1]      Docket No. 347.  Unless otherwise indicated herein, all references to "Docket No. __" relate to the main chapter 11 case, No. 23-12237 (DER). Capitalized terms used but otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

**Error! Unknown document property name.**

of equity distributions, grossly inflated salaries (including for no-show jobs) and bonuses, and credit card reimbursements for extravagant personal goods.

3.      Making matters worse, Defendants' excessive plunder was made possible in part by nearly $4 million in Paycheck Protection Program ("PPP") loans meant to allow the Debtor to continue paying its workers during the COVID-19 Pandemic.  But more than double that went instead to support the lavish spending of the Greenberg family Defendants.

4.      All, or at least the vast majority, of these payments to Defendants were preferences or fraudulent transfers to insiders of the Greenberg family because the Debtor was insolvent at the time the payments were made.  Indeed, the Debtor was insolvent for the entire period stretching back to at least March 2020.

5.      With the Debtor limping along in insolvency, the insider Defendants made sure that they were generously paid ahead of the Debtor's other creditors.  These payments included nearly $2 million in equity distributions to certain of the Defendants as equity holders starting in 2020.

6.      The payments also included grossly inflated compensation to Greg Greenberg as president of the Debtor.  Upon information and belief, Greg's salary was excessive considering his job responsibilities.  Indeed, the previous president of the Debtor made approximately $250,000 per year with additional modest bonuses.  But Greg, as an insider, made sure his all-in compensation with salary and bonuses ballooned

3

to as much as $2.8 million in 2021, with his total compensation for the period from 2020-2023 adding up to $6 million.

7.      Greg was not the only Greenberg family member who received an inflated salary.  Amanda Greenberg, Greg's sister, received a total of $156,000 over the course of 2020-2023 for a no-show job. Similarly, Tiffany Shade, Greg's former sister-in-law, took home $169,000 over the course of 2020-2023 for a no-show job.

8.      Finally, Greg expensed nearly $700,000 in credit card payments over the course of the three years dating back to 2020.  These payments included thousands of dollars to the luxury Balenciaga brand, along with other personal expenses at Amazon, Target, and Dick's Sporting Goods, among other retailers.

9.      These payments to Defendants totaling nearly $9 million must be avoided and returned to Plaintiff.

## JURISDICTION AND VENUE

10.     This Court has subject-matter jurisdiction over this adversary proceeding, which arises under title 11, arises in, and relates to a case under title 11, in the United States Bankruptcy Court for the District of Maryland (the "Court"), captioned *In re ESCO, Ltd.*, Case No. 23-12237 (DER), pursuant to 28 U.S.C. §§ 157 and 1334(b) and Article XII of the Plan.

Error! Unknown document property name.

11.     This adversary proceeding is a "core" proceeding to be heard and determined by the Court pursuant to 28 U.S.C. § 157(b)(2)(B), (F) and (H), and the Court may enter final orders for matters contained herein.

12.     Venue is proper in this district pursuant to 28 U.S.C. § 1409.

13.     The statutory and legal predicates for the relief sought herein are sections 544, 547, 548, and 550 of the Bankruptcy Code and Rule 7001 of the Federal Rules of Bankruptcy Procedure and applicable state law.

14.     Pursuant to Rule 7012-1 of the Local Bankruptcy Rules of the United States Bankruptcy Court for the District of Maryland, Plaintiff hereby consents to the entry of a final order by the Court in connection with this Complaint, if it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## PROCEDURAL BACKGROUND

15.     On March 31, 2023 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with this Court.  From the Petition Date through the Effective Date (defined below) of the Plan, the Debtor remained in possession of its assets and continued to operate and manage its business as debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

16.     On November 16, 2023, the Court entered the *Order Granting Final Approval of Disclosure Statement and Confirming Chapter 11 Plan of Liquidation Of Debtor ESCO, Ltd.*

(the "<u>Confirmation Order</u>")[2] confirming the Plan in the form attached as Exhibit A to the Confirmation Order.

17.    The Plan became effective on November 20, 2023 (the "<u>Effective Date</u>").[3] On the Effective Date, Plaintiff was established pursuant to the terms of the Plan and the terms of that certain *Liquidating Trust Agreement and Declaration of Trust* dated as of October 23, 2023 (the "<u>LTA</u>" and, together with the Plan and Confirmation Order, the "<u>Plan Documents</u>").[4]  On the Effective Date, all of the Liquidating Trust Assets, and all Causes of Action,[5] automatically vested in the Plaintiff.[6]

## **THE PARTIES**

18.    Prior to the Effective Date of the Plan, the Debtor was a footwear, apparel, and accessories retailer offering men's, women's, and children's products from consumer brands such as Nike, Adidas, and Puma.  As of the Petition Date, the Debtor was organized under the laws of Maryland, headquartered in Maryland, and operated 39 stores in Maryland, Virginia, and the District of Columbia.

---

[2]    Docket No. 389.

[3]    Docket No. 392.

[4]    *See* Plan § VI.

[5]    *Id.* § 1.11.

[6]    *Id.* § 6.05.

6

19.     The Debtor was a family-owned business that was founded by Israel Freedman and his brother in the 1940s, and later run by Freedman's son-in-law Defendant Theodore Greenberg and grandson Defendant Greg Greenberg.

20.     Upon information and belief, Greg Greenberg was, at all relevant times, President of the Debtor, a member of Debtor's Board of Directors, and ran the Debtor's day-to-day business.  Greg was also an equity holder and an insider of the Debtor.

21.     Upon information and belief, Theodore Greenberg was, at all relevant times, Chief Executive Officer of the Debtor, a member of the Debtor's Board of Directors and an equity holder of the Debtor.  Theodore is an insider of the Debtor.

22.     Upon information and belief, Beth Greenberg was, at all relevant times, an equity holder of the Debtor.  Beth is an insider of the Debtor.

23.     Upon information and belief, Greenberg Family 2012 Irrevocable Trust No. 1 ("Trust No. 1") was, at all relevant times, an equity holder of the Debtor.  Trust No. 1 is an insider of the Debtor.

24.     Upon information and belief, Greenberg Family 2012 Irrevocable Trust No. 2 ("Trust No. 2") was, at all relevant times, an equity holder of the Debtor.  Trust No. 2 is an insider of the Debtor.

25.     Upon information and belief, Greenberg Family 2012 Irrevocable Trust No. 3 ("Trust No. 3") was, at all relevant times, an equity holder of the Debtor.  Trust No. 3 is an insider of the Debtor.

Error! Unknown document property name.

26.     Upon information and belief, Greenberg Family 2017 Irrevocable Trust No. 4 ("Trust No. 4") was, at all relevant times, an equity holder of the Debtor.  Trust No. 4 is an insider of the Debtor.

27.     Upon information and belief, Greenberg Family 2017 Irrevocable Trust No. 5 ("Trust No. 5", and together with Trust No. 1, Trust No. 2, Trust No. 3, and Trust No. 4, the "Greenberg Trusts") was, at all relevant times, an equity holder of the Debtor.  Trust No. 5 is an insider of the Debtor.

28.     Upon information and belief, Amanda Greenberg is Theodore's daughter and Greg's sister.  She collected a salary from the Debtor for an undefined role.   Amanda is an insider of the Debtor.

29.     Upon information and belief, Tiffany Shade is the ex-wife of Brad Greenberg (the deceased son of Theodore and deceased brother of Greg and Amanda), and collected a salary from the Debtor as an Administrative Assistant.  Tiffany is an insider of the Debtor.

30.     The equity of the Debtor was entirely owned by family members and family trusts of the Freedmans and Greenbergs, including Defendants Greg, Theodore, Beth, and the Greenberg Trusts.

Error! Unknown document property name.

31.    The Plan Documents appointed Steven Balasiano (the "<u>Trustee</u>") to administer Plaintiff.[7]   Among other things, under the Plan Documents, Plaintiff and Trustee are authorized to "protect and enforce the rights to the Trust Assets vested in the Trust . . . by any method deemed appropriate, including, without limitation, by judicial proceedings or otherwise,"[8] "investigate any Trust Assets"[9] and to "pursue, commence, prosecute, compromise, settle, dismiss, release, waive, withdraw, abandon, or resolve all Causes of Actions that are Trust Assets."[10]

## FACTUAL BACKGROUND

**Plaintiff's Investigation**

32.    Upon the Effective Date, pursuant to the authority afforded Plaintiff under the Plan Documents, Plaintiff undertook to investigate Liquidating Trust Assets, which include, among other things, the Debtor's Causes of Action.

33.    Plaintiff has conducted an analysis of the Debtor's readily available information and is seeking to avoid all of the transfers of an interest of the Debtor's property made by the Debtor to Defendants within the applicable periods as either preferential or fraudulent transfers.

---

[7]        Confirmation Order ¶¶ I.L, 11; LTA § 2.7.

[8]        LTA § 3.2.6.

[9]        LTA § 3.2.7.

[10]       LTA § 3.2.10.

Error! Unknown document property name.

34.    Through a review of the Debtor's records, Plaintiff performed its own due diligence evaluation of the known and reasonably knowable affirmative defenses (if any) available to Defendant, including section 547(c)(4) of the Bankruptcy Code, assessing the data available with respect to the elements of that defense.  Based upon this review, Plaintiff has determined that the claims to avoid the Transfers herein are viable and presented in good faith.

35.    As part of the Plaintiff's investigation, a third-party valuation firm was contacted to conduct a preliminary solvency analysis. Upon information and belief of the third party, the Debtor was insolvent as of March 2020 through the Petition Date.  The third party concluded that the fair market value of the Debtor's assets between fiscal years 2020 through 2022 was never greater than the stated liabilities, which were consistently greater than $10,500,000, and at times, above $17,000,000. With liabilities materially exceeding the fair market value of the Debtor's Assets, the Debtor was recognized to be insolvent per the Balance Sheet test.

36.    Based on available information, the third-party valuation firm also believed that the Debtor would likely have failed other insolvency tests such as the Capital Adequacy test. They reached this conclusion given that between fiscal year 2020 and 2022, the Debtor (1) failed multiple times to maintain certain capital requirements set with its lender group under the Revolver Loan agreement (these tests are set by lenders to assess whether the Debtor's earnings are adequate to cover future obligations); (2) failed to raise

10

new capital to support the business (including an unsuccessful sale process); and (3) continued to operate the business at a growing net loss.

37.     Despite Debtor's insolvency, Debtor made avoidable transfers during the three years before the Petition Date (the "<u>Transfer Period</u>") and one year before the Petition Date (the "<u>Preference Period</u>") to the insider Defendants in the form of equity distributions, compensation, and reimbursements for credit card expenses (each a "<u>Transfer</u>," and together the "<u>Transfers</u>").[11]  These Transfers to the insider Defendants total nearly $9 million.

38.     Notably, these transfers occurred at a time when the Debtor had received approximately $4 million in PPP Loans to assist during the COVID-19 pandemic.

39.     During the course of this adversary proceeding, Plaintiff may learn (through discovery or otherwise) of additional transfers made to Defendants during the Transfer Period or Preference Period.  It is Plaintiff's intention to avoid and recover all transfers made by the Debtor of an interest of in the Debtor's property and to or for the benefit of Defendants or any other transferee.  Plaintiff reserves its right to amend this original Complaint to include: (i) further information regarding the Transfers and the Other Transfers, (ii) additional transfers, (iii) modifications of and/or revisions to

---

[11] Plaintiff's conclusion that the Debtor was insolvent is not surprising. The Debtor's Chief Restructuring Officer admitted that the "Debtor incurred operating losses of approximately $280,000 and $1.76 million in fiscal years 2020 and 2021, respectively, which had a significant negative impact on the Debtor's financial position and liquidity." *See Declaration of Stanley W. Mastil, Chief Restructuring Officer, in Support of Debtor's Chapter 11 Petition and First Day Motions*, *In ESCO, Ltd.*, No. 23-12237 (DER), (Apr. 3, 2023 Bankr. D. Md.) (ECF No. 35) ¶ 19.

Error! Unknown document property name.

Defendant's name, (iv) additional defendants, and/or (v) additional causes of action (*e.g.*, but not exclusively under, 11 U.S.C. §§ 502(d), 542, 543, 544, 545, 549 and/or 553) (collectively, the "Amendments"), that may become known to Plaintiff at any time during this adversary proceeding, through formal discovery or otherwise, and for the Amendments to relate back to this original Complaint.

### Equity Distributions

40.    Plaintiff seeks to recover nearly $2 million in equity distributions made to or on behalf of the Debtor's equity holders, including Greg, Theodore, Beth, and the Greenberg Trusts.

41.    Based on Plaintiff's investigation, it has identified $1,859,860 in distributions to or on behalf of the equity holder insider Defendants:

| Month Paid | Description | Amount |
|---|---|---|
| July 2020 | VA Tax Payment - 2019 Form VA8879 - Greg | $187.00 |
| July 2020 | MD Tax Payment - 2019 Form MD502 - Greg | $68,677.00 |
| July 2020 | IRS 2019 Extension - Ted | $450,000.00 |
| July 2020 | IRS 2019 Extension - Greg | $383,276.00 |
| July 2020 | IRS 2019 Trust #4 | $48,848.00 |
| August 2020 | IRS Trust #4 Estimated 2020 payment #1 & #2 | $17,500.00 |
| September 2020 | IRS Trust #4 Estimated 2020 payment #3 | $8,750.00 |
| December 2020 | 2020 Form 1040-ES - Ted | $175,000.00 |
| December 2020 | 2020 Form 1040-ES - Greg | $170,000.00 |
| April 2021 | Isreal Freedman - Equalizing Distribution Payable | $9,293.00 |
| April 2021 | Ted Greenberg - Equalizing Distribution Payable | $5,081.00 |

Error! Unknown document property name.

| April 2021 | Greenberg Family Trust #1 - Equalizing Distribution - Payment received | ($48,000.00) |
|---|---|---|
| April 2021 | Greenberg Family Trust #2 - Equalizing Distribution Payable | $7,027.00 |
| April 2021 | Greenberg Family Trust #3 - Equalizing Distribution Payable | $3,640.00 |
| April 2021 | Greenberg Family Trust $4 - Equalizing Distribution Payable | $74,441.00 |
| April 2021 | Greenberg Family Trust #5 - Equalizing Distribution Payable | $31.00 |
| May 2021 | IRS 2020 Form 4868 - Ted | $10,000.00 |
| May 2021 | IRS 2020 Form 4868 - Greg | $52,000.00 |
| June 2021 | 2021 Form 1040 ES - Ted Q2 | $107,500.00 |
| June 2021 | 2021 Form 1040 ES - Greg Q2 | $55,000.00 |
| September 2021 | 1040 ES Q3 2021 - Greg | $27,500.00 |
| September 2021 | 1040 ES Q3 2021 - Trust #4 | $4,186.00 |
| September 2021 | 1040 ES Q3 2021 - Ted | $53,750.00 |
| January 2022 | 1040 ES Q3 2021 - Greg | $27,500.00 |
| January 2022 | 1040 ES Q3 2021 - Trust #4 | $4,400.00 |
| January 2022 | 1040 ES Q3 2021 - Ted | $53,750.00 |
| April 2022 | Greenberg Family Trust #4 | $90,523.00 |

**Compensation**

42.     Plaintiff also seeks to recover approximately $6 million in excess compensation to Greg, Amanda, and Tiffany Shade.  As part of Plaintiff's investigation, Plaintiff determined that Defendants continued to pay increasingly greater compensation to officers of the company and members of the Greenberg family. The investigation revealed that despite experiencing a $13 million decrease in yearly revenue from 2019 to 2022, officer compensation increased from 1.7% of Debtor revenue in 2019 to 5.3% of Debtor revenue by 2022, reflecting an increase of $1.7 million over that period of Debtor income paid to the pockets of Greg Greenberg and other officers of the closely-held

13

company.  These payments are in addition to compensation paid for no-show jobs to Amanda Greenberg and Tiffany Shade. Based on these findings, Plaintiff has identified the following payments reflecting inflated compensation.

43.    During the Transfer Period, Greg received total compensation of $5,862,983.07.   This included $1,257,027.79 for the nine relevant months in 2020; $2,841,019.77 for 2021; $1,554,831.65 for 2022; and $210,103.86 for the beginning of 2023. Greg was paid every other week with gross pay of $32,492.31 and take-home pay in amounts ranging from $16,564.79 to $19,663.06.   He also received additional bonus payments in gross amounts ranging from $60,000 to $80,000 with net payments of between $40,000 and $60,000.

44.    Upon information and belief, this grossly exceeded the market rate considering his job responsibilities and the compensation for similarly situated officers. Indeed, Plaintiff's investigation revealed that Greg's immediate successor made approximately $250,000 per year with modest additional bonuses.  Additionally, upon information and belief, Debtor did not receive any additional value in exchange for the drastic increase in the President's compensation, nor did the responsibilities of the President of the Debtor increase, when Greg succeeded the role.

45.    During the Transfer period, Amanda Greenberg received total compensation of $156,119.07, for an undefined role where she appeared to do no work. Plaintiff's investigation did not yield any evidence that Amanda contributed to the

Error! Unknown document property name.

Debtor's business during the Transfer Period. Indeed, a review of her emails shows she did not send any emails after 2011. Additionally, upon information and belief, Amanda lives in Florida where Debtor did not have any offices or stores.

46. During the Transfer period, Tiffany Shade received total compensation of $169,404.83 as an administrative assistant. However, upon information and belief, Tiffany did not perform the work of an administrative assistant and did not perform work for the Debtor. Indeed, she did not even have a company email account. Moreover, emails indicate that Tiffany's salary more than doubled from $35,568 to $75,000 at the direction of Greg in July 2020 without any further justification. Similarly, she was then cut from the payroll in September 2022 at the direction of Greg without further explanation.

### Credit Card Expenses

47. Plaintiff seeks to recover the approximately $700,000 in credit card payments on behalf of Greg Greenberg. Based on Plaintiff's investigation, Greg spent $671,095.54 on the company credit card, largely for personal expenses including meals, gas, and shopping sprees at Balenciaga, Amazon, Target, and Dick's Sporting Goods, among other retailers. Upon information and belief, Greg intentionally and fraudulently misrepresented that these personal expenditures were work-related when seeking reimbursement.

15

**CLAIMS FOR RELIEF**

**COUNT I**
**(Avoidance of Preference Period Transfers – 11 U.S.C. § 547)**

48.     Plaintiff incorporates all preceding paragraphs as if fully re-alleged herein.

49.     As more particularly described herein, during the Preference Period, the Debtor made certain of the Transfers identified in paragraphs 40 through 47 above to Defendants.

50.     Each Transfer constituted a transfer of an interest in property of the Debtor.

51.     During the Preference Period, Defendants were creditors of the Debtor at the time of each Transfer.

52.     Each Transfer was to or for the benefit of a creditor within the meaning of 11 U.S.C. § 547(b)(1), because each Transfer either reduced or fully satisfied a debt or debts then owed by the Debtor.

53.     Each Transfer was made for, or on account of, an antecedent debt or debts owed by the Debtor to Defendants before such Transfers were made, in that during the Preference Period.

54.     Each Transfer was made while the Debtor was insolvent.  Plaintiff is also entitled to the presumption of insolvency for each Transfer made during the Preference Period pursuant to 11 U.S.C. § 547(f).

55.     As a result of each Transfer, Defendants received more than they would have received if: (i) the Debtor's case was a case under Chapter 7 of the Bankruptcy Code;

16

(ii) the Transfers had not been made; and (iii) Defendants received payments of their debts under the provisions of the Bankruptcy Code.

56.     In accordance with the foregoing, each Transfer is avoidable pursuant to 11 U.S.C. § 547(b).

## COUNT II
### (Avoidance of Fraudulent Conveyances – 11 U.S.C. § 548(a)(1)(B))

57.     Plaintiff incorporates all preceding paragraphs as if fully re-alleged herein.

58.     To the extent one or more of the Transfers set forth in paragraphs 40 through 47 were not made on account of an antecedent debt, or was a prepayment for goods and/or services subsequently received, subject to proof, Plaintiff pleads in the alternative that the Debtor did not receive reasonably equivalent value in exchange for such Transfer(s) (the "Potentially Fraudulent Transfers") and:

A.     was insolvent as of the date of the Potentially Fraudulent Transfers, or became insolvent as a result of the Potentially Fraudulent Transfers; or

B.     was engaged, or about to engage, in business or a transaction for which any property remaining with the Debtor or for whose benefit the Potentially Fraudulent Transfers was made was an unreasonably small capital; or

C.     at the times relevant to this Complaint, intended to incur, or believed it would incur, debts beyond its ability to pay upon maturity; or

17

D.     made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

59.    Based upon the foregoing, the Potentially Fraudulent Transfers are avoidable pursuant to 11 U.S.C. § 548(a)(1)(B).

## <u>COUNT III</u>
**(Avoidance of Fraudulent Transfer Pursuant to State Law – 11 U.S.C. § 544 and Applicable State Law)**

60.    Plaintiff incorporates all preceding paragraphs as if fully re-alleged herein.

61.    Plaintiff brings this claim under section 544(b)(2) of the Bankruptcy Code, and applicable law including, but not limited to, the Maryland Fraudulent Conveyance Laws as enacted in the state of Maryland.

62.    To the extent one or more of the Transfers set forth in paragraphs 40 through 47 were not made on account of an antecedent debt, or was a prepayment for goods and/or services subsequently received, subject to proof, Plaintiff pleads in the alternative that the Debtor did not receive reasonably equivalent value in exchange for such Transfer(s) (the "<u>Additional Potential Fraudulent Transfers</u>") and:

A.     was insolvent as of the date of the Additional Potential Fraudulent Transfers, or became insolvent as a result of the Additional Potential Fraudulent Transfers; or

**Error! Unknown document property name.**

    B.      was engaged, or about to engage, in business or a transaction for which any property remaining with the Debtor or for whose benefit the Additional Potential Fraudulent Transfers was made was an unreasonably small capital; or

    C.      at the times relevant to this Complaint, intended to incur, or believed it would incur, debts beyond its ability to pay upon maturity.

63.    Based upon the foregoing, the Additional Potential Fraudulent Transfers are avoidable pursuant to 11 U.S.C. § 544(b)(2) and applicable state law.

## <u>COUNT IV</u>
### (Recovery of Avoided Transfers – 11 U.S.C. § 550)

64.    Plaintiff incorporates all preceding paragraphs as if fully re-alleged herein.

65.    Plaintiff is entitled to avoid the Transfer(s) pursuant to 11 U.S.C. § 547(b) and/or any Potentially Fraudulent Transfers and Additional Potential Fraudulent Transfers pursuant to 11 U.S.C. § 544, 548, and applicable state law (collectively, the "<u>Avoidable Transfers</u>").

66.    Defendants were the initial transferee of the Avoidable Transfer(s) or the immediate or mediate transferees of such initial transferee or the person for whose benefit the Avoidable Transfer(s) were made.

67.    Pursuant to 11 U.S.C.§ 550(a), Plaintiff is entitled to recover from Defendants the Avoidable Transfer(s), plus (i) pre- and post-judgment interest thereon

Error! Unknown document property name.

from the date of demand to the date of payment or other satisfaction of such order and judgment and (ii) the costs of this action.

## COUNT V
### (Breach of Fiduciary Duties against Greg Greenberg and Theodore Greenberg)

68.    Plaintiff incorporates all preceding paragraphs as if fully re-alleged herein.

69.    As officers and directors of the Debtor, Greg Greenberg and Theodore Greenberg owed to the Debtor fiduciary duties of care and loyalty.

70.    Greg Greenberg and Theodore Greenberg breached these duties by approving salaries for Greg Greenberg, Amanda Greenberg, and Tiffany Shade that were grossly disproportionate to the value each employee provided to the Debtor.

71.    As a result of Greg Greenberg's and Theodore Greenberg's misconduct, Debtor was harmed by paying substantially more money than necessary.

## COUNT VI
### (Intentional Fraud against Greg Greenberg)

72.    Plaintiff incorporates all preceding paragraphs as if fully re-alleged herein.

73.    Upon information and belief, Greg Greenberg knowingly and intentionally misrepresented that payments made using his company credit card were for work-related expenses.  Instead, many or all the expenses were personal in nature.

74.    Greg Greenberg knew that the expenses were personal in nature but used his company credit card to defraud the Debtor by requesting reimbursement and causing the Debtor to pay for personal expenses.

20

Error! Unknown document property name.

75.     The Debtor reasonably relied on Greg Greenberg's misrepresentation.

76.     As a result, the Debtor suffered injury by paying for Greg Greenberg's personal expenditures.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that this Court grant the following relief against Defendants:

A.     On Plaintiff's First, Second, Third, and Fourth Claims for relief, judgment in favor of Plaintiff and against Defendants, avoiding all of the Avoidable Transfers and directing Defendants to return to Plaintiff the amount of the Avoidable Transfers, pursuant to 11 U.S.C. §§ 547(b) and/or 548 and 550(a), plus pre- and post-judgment interest from the date of demand at the maximum legal rate and to the fullest extent allowed by applicable law, together with the costs and expenses of this action, including, without limitation, attorneys' fees; and

B.     On Plaintiff's Fifth Claim for relief, judgment in favor of Plaintiff and against Defendants Greg Greenberg and Theodore Greenberg for damages in an amount to be determined at trial, pre-judgment and post-judgment interest, and together with the costs and expenses of this action, including, without limitation, attorneys' fees; and

C.     On Plaintiff's Sixth Claim for relief, judgment in favor of Plaintiff and against Defendant Greg Greenberg for damages in an amount to be determined at trial, pre-judgment and post-judgment interest, and together with the costs and expenses of this action, including, without limitation, attorneys' fees; and

D.     Granting Plaintiff such other and further relief as this Court may deem just and proper.

Dated: Baltimore, MD
      December 6, 2024

<u>/s/ *Gary H. Leibowitz*</u>
Gary H. Leibowitz
**COLE SCHOTZ P.C.**
1201 Wills Street, Suite 320
Baltimore, MD 21031
Tel: (410) 528-2971
Fax: (410) 230-0667
Email: gleibowitz@coleschotz.com

James S. Carr (admitted *pro hac vice*)
Levi M. Downing (admitted *pro hac vice*)
**KELLEY DRYE & WARREN LLP**
3 World Trade Center
175 Greenwich Street
New York, New York 10007
Tel:  (212) 808-7800
Fax:  (212) 808-7897
Email: jcarr@kelleydrye.com
      ldowning@kelleydrye.com

*Counsel to Plaintiff The ESCO, Ltd. Liquidating Trust*

**Error! Unknown document property name.**